<u>**NOT YET SCHEDULED FOR ORAL ARGUMENT**</u>

**No. 13-7049**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**
_____

**UNITED STATES OF AMERICA *ex rel*. BRADY FOLLIARD,**

*Plaintiff-Appellant,*

**v.**

**GOVPLACE,**

*Defendant-Appellee.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**
_____

**BRIEF OF APPELLEE
GOVPLACE**
_____

Christopher M. Loveland
(D.C. Bar No. 473969)
Jonathan S. Aronie
(D.C. Bar No. 443151)
Sheppard Mullin Richter & Hampton LLP
1300 I Street, N.W., 11th Floor East
Washington, D.C. 20005-3314
Tel. (202) 772-5313
Fax (202) 312-9432
cloveland@sheppardmullin.com
jaronie@sheppardmullin.com

Dated: August 30, 2013          *Attorneys for Appellee Govplace*

**CERTIFICATE AS TO PARTIES,
RULINGS, AND RELATED CASES**

## I.    PARTIES

All parties, intervenors, and amici appearing before the district court, and all parties and intervenors appearing before this Court are listed in the Brief of Appellant, Brady Folliard.  In addition, Govplace has been informed that The Coalition for Government Procurement intends to appear before this Court as amicus curiae.

## II.    RULINGS UNDER REVIEW

References to the rulings at issue appear in the Brief of Appellant, Brady Folliard.

## III.    RELATED CASES

The case on review was not previously before this Court or any other court. There are no related cases.

# RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, appellee Govplace hereby states, by and through undersigned counsel, that it does not have a parent company and that no publicly-held company owns 10 percent or more of its stock.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES ...........................................................i

RULINGS, AND RELATED CASES.......................................................i

RULE 26.1 DISCLOSURE STATEMENT............................................. ii

TABLE OF CONTENTS................................................................ iii

TABLE OF AUTHORITIES ...........................................................vi

GLOSSARY ..................................................................................x

STATEMENT OF ISSUES PRESENTED FOR REVIEW .......................1

STATEMENT OF THE CASE.............................................................2

STATEMENT OF THE FACTS ...........................................................8

SUMMARY OF THE ARGUMENT .................................................18

ARGUMENT .................................................................................21

I.    LEGAL STANDARDS ...........................................................21

     A.    The Standard Of Review For Discovery Orders.................................21

     B.    The Standard Of Review For Summary Judgment Orders.................22

     C.    Elements Of A Claim Under The False Claims Act. .........................22

II.   THE DISTRICT COURT'S ORDERS LIMITING THE SCOPE OF
     DISCOVERY TO THE ALLEGATIONS IN THE COMPLAINT
     WERE PROPER AND SHOULD BE AFFIRMED. ....................................24

     A.    The District Court Properly Limited Discovery To The Sales
          Actually Alleged In The Second Amended Complaint. ....................24

     B.    The District Court's Rulings Regarding Folliard's Rule 56(d)
          Requests Were Proper And Should Be Affirmed. ............................27

C.    The Cases Upon Which Folliard Chiefly Relies Do Not Support His Request For Discovery Unrelated To The Allegations In His Second Amended Complaint .................................................................. 30

III.    THE DISTRICT COURT'S ORDERS GRANTING SUMMARY JUDGMENT WERE PROPER AND SHOULD BE AFFIRMED .............. 33

A.    Folliard Does Not Appeal All Of The District Court's Orders Granting Summary Judgment Regarding Alleged Sales .................... 33

B.    The District Court Properly Dismissed Folliard's Claims Regarding The Twenty-Three Products Allegedly Offered For Sale By Govplace. ............................................................................... 34

C.    The District Court Properly Found There Was No Evidence That Govplace Knowingly Violated The FCA ............................................ 37

1.    Govplace Reasonably Relied On Country Of Origin Information It Received From Ingram Micro Through The GSA Pass Through Program………………................................. 39

a.    Govplace Participated In The Ingram Micro GSA Pass Through Program To Ensure Compliance With GSA Schedule Requirements. ........................................ 39

b.    Govplace's Reliance On Country Of Origin Representations From Ingram Micro Was Reasonable. .................................................................. 41

c.    The Government Tacitly Approved Govplace's Reliance On Ingram Micro's Certifications. ................. 46

2.    The Discovery Produced By Govplace Further Supports The District Court's Finding That The Company Did Not Violate The FCA………………................................. 47

a.    The Unsolicited Email Govplace Received From HP Confirms That The Products Were TAA-Compliant ................................................................ 48

b.    The Unsolicited Tech Data Price Lists Also Confirm That Products Were TAA-Compliant. ............. 50

        c.      Summary Judgment Is Appropriate Where, As Here, There Is No Evidence Of A TAA Violation, Let Alone Intent To Deceive. .........................................53

D.    The Albright Declarations Did Not Comply With Rule 56(c)(4) And Were Unreliable..........................................................................55

      1.     The Albright Declarations Violated Rule 56(c)......................56

      2.     The Albright Declarations Were Unreliable............................58

CONCLUSION ....................................................................................61

CERTIFICATE OF COMPLIANCE ....................................................62

CERTIFICATE OF SERVICE ............................................................63

# TABLE OF AUTHORITIES

Page(s)

Cases

Bettis v. Odebrecht Contractors of Cal., Inc.
  393 F.3d 1321 (D.C. Cir. 2005) ............................................................22

Burlington N. Santa Fe R.R. Co. v. Assiniboine & Sioux Tribes of Fort Peck
  Reservation
  323 F.3d 767 (9th Cir. 2003) ................................................................32

Catawba Cnty., N.C. v. EPA
  571 F.3d 20 (D.C. Cir. 2009 .................................................................34

Celotex Corp. v. Catrett
  477 U.S. 317 (1986) ..............................................................................28

*Convertino v. U.S. Dep't of Justice
  684 F.3d 93 (D.C. Cir. 2012) ..................................................28, 30, 31

Crane Helicopter Servs., Inc. v. United States
  45 Fed. Cl. 410 (Fed. Cl. 1999) ....................................................45, 46

Gaujacq v. EDF, Inc.
  601 F.3d 565 (D.C. Cir. 2010) .............................................................21

Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel.
  Wilson
  545 U.S. 409 (2005) ..............................................................................23

Hageny v. United States
  570 F.2d 924 (Ct. Cl. 1978) .................................................................23

Londrigan v. Fed. Bureau of Investigation
  670 F.2d 1164 (D.C. Cir. 1981) ...........................................................57

Lopez-Carrasquillo v. Rubianes
  230 F.3d 409 (1st Cir. 2000) ................................................................57

*McWay v. LaHood
  269 F.R.D. 35 (D.D.C. 2010) ........................................................28, 30

*Messina v. Krakower
   439 F.3d 755 (D.C. Cir. 2006)..........................................................21, 28, 30

In re Multi-Piece Rim Prods. Liab. Litig.
   209 U.S. App. D.C. 416 (D.C. Cir. 1981) ..........................................21

Northrop Corp. v. McDonnell Douglas Corp.
   751 F.2d 395 (D.C. Cir. 1984)............................................................21

Oppenheimer Fund, Inc. v. Sanders
   437 U.S. 340 (1978)............................................................................32

Estate of Parsons v. Palestinian Auth.
   651 F.3d 118 (D.C. Cir. 2011) ...........................................................24

*Schuhardt v. Wash. Univ.
   390 F.3d 563 (8th Cir. 2005) .......................................................24, 26

Sparrow v. United Air Lines, Inc.
   216 F.3d 1111 (D.C. Cir. 2000)..........................................................31

United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.
   297 F. Supp. 2d 272 (D.D.C. 2004 .....................................................38

United States ex rel. Crennen v. Dell Mktg. L.P.
   711 F. Supp. 2d 157 (D. Mass. 2010)..................................................36

*United States ex rel. Duxbury v. Ortho Biotech Prods.
   719 F.3d 31 (1st Cir. 2013)........................................................24, 25, 26

*United States ex rel. Ervin and Assocs., Inc. v. The Hamilton Sec. Grp., Inc.
   298 F. Supp. 2d 91 (D.D.C. 2004 .................................................42, 54

United States ex rel. Ervin and Assocs., Inc. v. Hamilton Sec. Grp., Inc.
   370 F. Supp. 2d 18 (D.D.C. 2005)...........................................36, 43, 44

*United States ex rel. Folliard v. CDW Tech. Servs., Inc.
   722 F. Supp. 2d 20 (D.D.C. 2010)......................................................36

*United States ex rel. Folliard v. Hewlett-Packard Co.
   272 F.R.D. 31 (D.D.C. 2011)..............................................................36

\*United States ex rel. Hill v. Univ. of Med. & Dentistry of N.J.
 448 Fed. Appx. 314 (3d Cir. 2011) ..................................................54

United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.
 498 F. Supp. 2d 25 (D.D.C. 2007) ..................................................22

United States ex rel. Hopper v. Anton
 91 F.3d 1261 (9th Cir. 1996) ..........................................................55

United States ex rel. Joe Liotine v. CDW Gov't
 Civil Action No. 05-00033-DRH-CJP ............................................55

United States ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency
 530 F.3d 980 (D.C. Cir. 2008) ...................................................37, 38

United States ex rel. K & R Ltd. P'shp v. Mass. Hous. Fin. Agency
 456 F. Supp. 2d 46 (D.D.C. 2006) ...........................................22, 37, 38

United States ex rel. Lamers v. City of Green Bay
 168 F.3d 1013 (7th Cir. 1999) ........................................................55

United States ex rel. Lockyer v. Haw. Pac. Health
 490 F. Supp. 2d 1062 (D. Haw. 2007) .............................................54

\*United States ex rel. Schuhardt v. Wash. Univ.
 361 F. Supp. 2d 992 (E.D. Mo. 2003) ..............................24, 25, 26, 30

United States ex rel. Schwedt v. Planning Research Corp.
 59 F.3d 196 (D.C. Cir. 1995) ..........................................................22

United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.
 214 F.3d 1372 (D.C. Cir. 2000) ......................................................38

\*United States ex rel. Taylor-Vick v. Smith
 513 F.3d 228 (5th Cir. 2008) ..........................................................54

United States ex rel. Totten v. Bombardier Corp. & Envirovac, Inc.
 286 F.3d 542 (D.C. Cir. 2002) ........................................................36

United States v. Ekelman & Assocs., Inc.
 532 F.2d 545 (6th Cir. 1976) ..........................................................23

United States v. Krizek
    111 F.3d 934 (D.C. Cir. 1997)............................................................38

United States v. Milton
    602 F.2d 231 (9th Cir. 1979) ...........................................................23

United States v. Ueber
    299 F.2d 310 (6th Cir. 1962) ...........................................................23

United States v. Watkins
    519 F.2d 294 (D.C. Cir. 1975)...........................................................58

Watts v. SEC
    482 F.3d 501 (D.C. Cir. 2007)...........................................................21

World Wide Minerals, Ltd. v. Republic of Kaz.
    296 F.3d 1154 (D.C. Cir. 2002)..........................................................34

Statutes

31 U.S.C. § 3730(e)(4)(A) ...................................................................27

31 U.S.C. § 3730(e)(4)(B) ...................................................................27

31 U.S.C. § 3731................................................................................23

Other Authorities

FED. R. CIV. P. 56(c)(4)........................................................................56

FED. R. CIV. P. 56(d). ................................................................4, 18, 21

FAR 52.225-5). ..........................................................................49, 62, 63

FAR 25.401 (a)(1)-(5) .........................................................................60

# GLOSSARY

FCA – False Claims Act

FOIA – Freedom of Information Act

GSA – U.S. General Services Administration

HP – Hewlett-Packard Company

IT – information technology

TAA – Trade Agreements Act

## <u>STATEMENT OF ISSUES PRESENTED FOR REVIEW</u>

I.    Whether the U.S. District Court for the District of Columbia (the "District Court") correctly limited the scope of discovery to the allegations against Govplace in the Corrected Second Amended Complaint pending a showing by relator Brady Folliard that the allegations had merit.

II.    Whether the District Court correctly granted summary judgment in favor of Govplace because (a) there was no evidence of any violations of the False Claims Act and (b) Govplace reasonably relied on country of origin information it received from its distributor, Ingram Micro, through Govplace's participation in the GSA Pass Through Program.

-1-

**STATEMENT OF THE CASE**

Relator Brady Folliard ("Folliard") filed his complaint in the U.S. District Court for the District of Columbia (the "district court") on April 20, 2007, alleging that the twelve named defendants violated the False Claims Act ("FCA") by selling information technology ("IT") products to the United States through their U.S. General Services Administration ("GSA") Schedule contracts from countries that were not Trade Agreements Act ("TAA")-compliant.  Complaint [Dkt. 1].  Folliard filed his Corrected Second Amended Complaint ("Second Amended Complaint") on October 13, 2010, which reduced the number of defendants to eight, including Govplace.  Sec. Am. Complaint [Dkt. 37].

Folliard, a serial relator,[1] was an employee of Insight Public Sector and did not have any information regarding Govplace's sales processes, procedures and practices.  Am. Complaint [Dkt. 37].  Despite this lack of direct knowledge, Folliard alleged that Govplace offered for sale twenty-three products to the United States that allegedly did not comply with the TAA and "offered and sold" eight Hewlett-Packard Company ("HP") products to the government that allegedly involved products manufactured in non-TAA-designated countries.  Id. ¶¶113, 117, 118.  Unlike the allegations in the Second Amended Complaint against many of

---

[1] As noted by the district court, "Folliard has been an active relator in recent years" (Mem. Op. p. 22, Dkt. 114), having filed at least five FCA lawsuits since 2007—all of which have been dismissed.  GAI Summ. J. Mot. p. 1 n.1 [Dkt. 126].

the other defendants—which specifically were alleged as being "representative" of

other sales—Folliard did not allege that the Govplace transactions were

"representative" of other alleged sales.  Mem. Op. p. 10 n.2 [Dkt. 156].  Nor did he

allege that there were any "other sales to be discovered." Id.

Govplace filed a motion to dismiss on December 10, 2010 (Dkt. 75), which

was denied by the district court on July 19, 2011.  Order [Dkt. 115].   In denying

the motion to dismiss, the court addressed Govplace's concerns regarding the

potential expansive scope of discovery in the case, noting that "[d]iscovery can be

pointed and efficient, with a summary judgment following on the heels of the

complaint if ... [Govplace's] records discredit the complaint's particularized

allegations.'" Mem. Op. p. 21[Dkt. 114].  The court further noted that, if Govplace

is "right in suggesting that Folliard's allegations are spurious, it should not be

difficult to proffer evidence and promptly file for summary judgment." Id. pp. 22-

23.

Supported by records discrediting "the complaint's particularized

allegations," Govplace filed a motion for summary judgment on December 2, 2011

regarding the alleged FCA violations in the Second Amended Complaint.  Summ.

J. Mot. [Dkt. 129].  As demonstrated in that motion, the twenty-three products

Govplace allegedly offered for sale did not violate the FCA because, as a matter of

law, merely offering products for sale to the government, without more, is not a

violation of the FCA.  Id. pp. 16-20.  Moreover, none of the eight allegedly non-TAA-compliant products that Govplace sold to the government constituted a FCA violation.  Id. pp. 20-24.

In his December 16, 2011 opposition brief, Folliard contended he needed additional discovery in order to respond to the motion for summary judgment.  Opp'n to Summ. J. pp. 2-3 [Dkt. 134].  Folliard's opposition, however, did not comply with Rule 56(d), FED. R. CIV. P., because it failed to explain why additional information was needed to respond to the motion; nor did he directly address most of the arguments raised in Govplace's motion, including purely legal arguments.  Mem. Op. [Dkt. 156].

Concurrently with his opposition brief, Folliard filed a motion to compel discovery regarding his first set of interrogatories (Mot. to Compel, Dkt. 135), which Govplace opposed on January 6, 2012.  Opp'n to Mot. to Compel [Dkt. 146].  Govplace objected to the interrogatories because they were part of an expansive fishing expedition seeking dozens of categories of information regarding thousands of discrete transactions over a nine year period.  Id.  Govplace also filed a motion for protective order on January 10 seeking to stay discovery pending a ruling on its motion for summary judgment.  Mot. for Prot. Order [Dkt. 147].

On May 3, 2012, the district court issued an Order granting, in part, Govplace's motion for summary judgment.  Order [Dkt. 155].  The court dismissed

SMRH:200969233.13

Counts III and IV "insofar as those claims assert a violation of the False Claims Act on the basis that a product was allegedly offered for sale, but no actual sale was alleged." <u>Id.</u>  The court also dismissed Folliard's motion to compel discovery without prejudice.  <u>Id.</u>

In its May 3 memorandum opinion, the district court clarified the statement in its July 19, 2011 memorandum opinion regarding the anticipated scope of discovery, making clear that the court was referring to discovery "related to the specific procurement orders enumerated in the complaint."  Mem. Op. p. 10 [Dkt. 156].  The court further explained that "if Folliard cannot respond to the sales he lists as 'representative,' he should not be entitled to discovery for other sales, not alleged in the complaint, on which he might prevail."  <u>Id.</u>

The district court also found that "Folliard's invocation of Rule 56(d) was improperly framed, as a Rule 56(d) request must 'state concretely' why additional discovery is needed."  Mem. Op. p. 10 [Dkt. 156].  However, to avoid "prejudice to either party based on the other side's misinterpretation of the Court's prior statements," the court ordered that "Folliard will be allowed to amend his opposition to each defendant's summary judgment motion, limited to the specific sales the complaint alleges as to each defendant."  <u>Id.</u> pp. 10-11.  The court further stated that "if Folliard prevails … on the specific sales alleged in the complaint, the question of further discovery will be ripe."  <u>Id.</u> p. 11.

On May 17, 2012, Folliard filed his supplemental opposition brief. Supp. Opp'n [Dkt. 158]. Folliard's supplemental opposition again failed to directly address the documentation and testimony in Govplace's motion for summary judgment, and further ignored the court's directive to only address transactions alleged in the Second Amended Complaint. Am. Summ. J. Reply [Dkt. 159]. Instead, Folliard attempted to resurrect claims that previously were dismissed by the district court, and sought expansive discovery regarding alleged transactions not in the Second Amended Complaint. Id.

On July 31, 2012, the district court issued a second Order granting, in part, Govplace's motion for summary judgment. Order [Dkt. 162]. The court granted summary judgment as to product numbers EV266AA, EY685AW, RM266UA, and CB367A. Id. The court denied summary judgment as to product numbers Q5403A, 41657-B21, AG052A, Q4503A[2], and Q5983A pending Folliard conducting "focused, targeted discovery for the next 45 days limited *only* to GP's reliance on Ingram Micro's Country of Origin representations for the sale of those products and whether the products sold were, as GP claims, from the United States

_____

[2] The reference to product numbers "Q4503A" and "41657-B21" in the Order were typographical errors. Supp. Summ. J. Mem. p. 1 n.1 [Dkt. 168]; Mem. Op. p. 3 n.1 [Dkt. 171]. The products at issue were "Q5403A" and "416577-B21." Id. There were four products (Q5403A, 416577-B21, AG052A and Q5983A) and five alleged transactions remaining. Id.

and Japan." Id.  The court further ordered the parties to file simultaneous supplemental memoranda addressing these questions.  Id.

On September 25, 2012, after Folliard had completed his discovery and in accord with the court's Order, Govplace filed a supplemental memorandum in support of its motion for summary judgment (Dkt. 168) and Folliard filed a supplemental memorandum in opposition to summary judgment (Dkt. 169).

On March 18, 2013, the district court granted summary judgment regarding the four remaining products (Q5403A, 416577-B21, AG052A and Q5983A) and dismissed the case with prejudice.  Order [Dkt. 170].  Although "the court ha[d] serious concerns about the source material and admissibility of [an affidavit proffered by Folliard and] … could grant Govplace summary judgment on the basis that Folliard cannot prove that Govplace submitted a false claim," the court instead focused on "Folliard's failure to provide evidence that Govplace acted 'knowingly'" because it "provides the strongest grounds for granting Govplace summary judgment." Id. p. 10.  The court found that, "[b]ased on the evidence provided by Folliard, Govplace's actions cannot amount to gross negligence plus, deliberate ignorance, or reckless disregard." Id. p. 22.

SMRH:200969233.13

## STATEMENT OF THE FACTS

Govplace is a small business provider of IT integration and product

solutions, and delivers enterprise IT solutions exclusively to the public sector.

Angle Aff. ¶3 [Dkt. 129-1].  Govplace has been a recipient of a GSA Schedule

contract since August 1, 1999.  Id. ¶4.  The GSA Schedule "is a vehicle" used by

"commercial firms to provide supplies and services to government agencies

throughout the world."  Am. Complaint ¶¶19, 20 [Dkt. 37].  Govplace is not a

manufacturer of the products it lists for sale to the government on its GSA

Schedule and does not acquire products directly from the manufacturer.  Angle

Aff. ¶7 [Dkt. 129-1].  Instead, Govplace acquires products from distributors.  Id.

Govplace acquires the vast majority of the products it sells on its GSA Schedule

Contract from Ingram Micro.  Id.  Ingram Micro is a Fortune 100 company and the

world's largest technology distributor with over 13,000 employees, including a

staff of experts in government contract compliance.  Robinson Aff. ¶5 [Dkt. 168-

1].  Ingram Micro distributes over $36 billion dollars in IT products annually,

including over $1.5 billion dollars in annual sales to the United States government,

and is one of the largest distributors of HP products in the world.  Id.

**Ingram Micro GSA Pass Through Program**

Beginning in or about 2003, Govplace has participated in the Ingram Micro

GSA Pass Through Program.  Robinson Aff. ¶6 [Dkt. 168-1].  The program is

designed for small businesses like Govplace, and allows Govplace to leverage Ingram Micro's resources and capabilities to help administer and ensure compliance with the terms of its GSA Schedule. Robinson Aff. ¶6 [Dkt. 168-1]. Over 100 value-added resellers actively utilize Ingram Micro's GSA Pass Through Program for, among other things, TAA compliance information. Id. Ingram Micro describes its GSA Pass Through Program on its website, and specifically states that the country of origin information it provides to resellers is certified by the manufacturer:

> Ingram Micro also helps resellers maintain their GSA contracts by regularly passing through manufacturer-certified information such as updated pricing and product documentation. These notifications include all data requirements on listed products, such as country of origin ….

Robinson Aff. ¶7 [Dkt. 168-1]. Ingram Micro further states that it expends a significant effort keeping this data up to date. Id.

To control the distribution of products and maintain the integrity of the supply channel, participation in the GSA Pass Through Program not only requires approval by Ingram Micro, but also the express approval of underlying manufacturers, such as HP. Robinson Aff. ¶6 [Dkt. 168-1]. Govplace obtained Letters of Supply from both Ingram Micro and HP authorizing it to resell HP products to the Federal government and participate in the Ingram Micro GSA Pass Through Program. Angle Aff. ¶7 [Dkt. 129-1]; Robinson Aff. ¶6 [Dkt. 168-1].

One of the HP Letters of Supply expressly authorized the sale of HP products by Govplace and "authorize[d] Ingram Micro corporation to provide a Letter of Supply to Govplace."  Robinson Aff. ¶9 [Dkt. 168-1]; S.O.F. ¶4 [Dkt. 129].  That Letter of Supply makes clear that HP carefully monitors the sale of its products through Ingram Micro and the GSA Schedule program, and requires that Ingram Micro obtain HP's written consent to supply Govplace with HP products for sale to the government.  Id.

Pursuant to the HP and Ingram Micro Letters of Supply, Govplace regularly received HP product lists from Ingram Micro.  Robinson Aff. ¶10 [Dkt. 168-1]. Those product lists contained tens of thousands of products that were sent to participants in the GSA Pass Through Program.  Id.  The products on these lists were intended to be sold through the GSA Schedule program in accord with its rules and regulations.  Id.  The transmittal emails expressly stated that the attached product lists constituted the "current GSA product/price list for Hewlett Packard." Angle Aff. ¶21 [Dkt. 129-1]; Robinson Aff. ¶11 [Dkt. 168-1].  Moreover, many of the transmittal emails Govplace received included the following express certification:

> Ingram Micro passes through the following manufacturer certifications: … Products offered by the manufacturer are compliant with the Trade Agreements Act.

SMRH:200969233.13

Angle Aff. ¶¶10, 21 [Dkt. 129-1]; Robinson Aff. ¶11 [Dkt. 168-1]. Those transmittal emails further stated that "[a]ny deleted items are being removed from the price list because they … no longer satisfy the requirements of the Trade Agreements Act …." Robinson Aff. ¶11 [Dkt. 168-1].

Like many small resellers, Govplace relied upon Ingram Micro's resources and capabilities for sales under its GSA Schedule contract, and utilized the Ingram Micro certifications as part of its GSA Schedule compliance program. Robinson Aff. ¶13 [Dkt. 168-1]. Govplace joined the Ingram Micro GSA Pass Through Program to help its two-person contracts team ensure compliance with GSA Schedule requirements, including compliance with the TAA. Robinson Tr. pp. 30, 34-36 [Dkt. 168-2]. Based on its due diligence of Ingram Micro, Govplace was confident that the country of origin information it received through the GSA Pass Through Program was in full compliance with the TAA. Id.

**Allegedly Non-TAA Products Listed
For Sale On The GSA Schedule**

Paragraph 113 of the Second Amended Complaint alleged that Govplace offered for sale—but did not allege Govplace ever sold—twenty-three products on its GSA Schedule in March 2007 that "were not made in a designated country." Sec. Am. Compl. ¶113 [Dkt. 37]. That allegation, however, was directly at odds with the country of origin information and TAA certifications that Govplace received from its distributor, Ingram Micro. Angle Aff. ¶¶19, 21 [Dkt. 129-1].

The Ingram Micro product lists from January 2007 and September 2007—both before and after the March 2007 time period that Folliard allegedly "compared some of the products offered by Defendant Govplace to a HP [country of origin] list"—expressly stated that each of the products listed in paragraph 113 was from a TAA-compliant country; namely, the United States and Great Britain.  Id.  These product lists from Ingram Micro also included the express certification that the "Products offered by the manufacturer are compliant with the Trade Agreements Act."  Id. ¶35.

**Allegedly Non-TAA Compliant Products Sold
Under the GSA Schedule Contract**

Paragraph 117 of the Second Amended Complaint alleged that Govplace "offered and sold" eight products "to the Government in violation of the Trade Agreements Act."  Sec. Am. Compl. ¶117 [Dkt. 37].  However, the product lists, TAA certifications, quotations, purchase orders and/or invoices associated with each of these alleged sales demonstrated that this allegation also was without merit.  Angle Aff. ¶22 [Dkt. 129-1].

*FirstSource Contract Sales Are Exempt
From TAA-Compliance*

Of the ten alleged sales of the eight products listed in paragraph 117 of the Second Amended Complaint, the seventh (RM266UA) and ninth (CB367A) sales listed were made by Govplace pursuant to its FirstSource Contract, not its GSA

Schedule contract.  Angle Aff. ¶¶23, 27 [Dkt. 129-1].  The FirstSource contract states that it "is awarded under a 100% Small Business Set-Aside …." Id. ¶25.  As a small business set-aside contract, the FirstSource contract is exempt under the FAR from TAA requirements.  Id. ¶26.

### Products Identified As Being Manufactured In TAA-Compliant Countries By Govplace's Distributor

Five of the remaining eight alleged sales listed in paragraph 117 of the Second Amended Complaint involved four products that were identified as being from TAA-compliant countries and subsequently certified as TAA-compliant by Ingram Micro.  Angle Aff. ¶¶28, 29 [Dkt. 129-1].  The third sale (Q5403A), fourth sale (416577-B21), fifth sale (AG052A), sixth sale (Q5403A) and tenth sale (Q5983A) listed were for products added to Govplace's GSA Schedule pursuant to the May 2006 and August 2006 Ingram Micro product lists.  Id. ¶30.

According to the country of origin information that Govplace received from Ingram Micro in May 2006, June 2006, August 2006, September 2006, October 2006, January 2007 and September 2007—both before and after the five alleged sales at issue—the third, fourth, fifth and sixth sales listed were for products manufactured in the United States, and tenth sale was for a product manufactured in Japan.  Angle Aff. ¶¶32, 34 [Dkt. 129-1]; Robinson Aff. ¶12 [Dkt. 168-1].  Both the United States and Japan are TAA-compliant countries.  Angle Aff. ¶33 [Dkt. 129-1].  Moreover, these products were expressly certified by Ingram Micro to be

TAA-compliant in January 2007 and September 2007, and included the following statement: "Products offered by the manufacturer are compliant with the Trade Agreements Act." Angle Aff. ¶35 [Dkt. 129-1].

### *Open Market Sales*

For two of the three remaining alleged sales listed in paragraph 117 of the Second Amended Complaint, the underlying transaction involved a sale that was made to the Government on the "open market" and did not involve a product listed for sale on Govplace's GSA Schedule Contract. Angle Aff. ¶36 [Dkt. 129-1].[3] The term "open market" is defined in the FAR and signifies a sale that is not subject to the terms and conditions of the GSA Schedule program. S.O.F. ¶19 [Dkt. 129]. The product number (EY685AW) for the second and eighth sales listed in the Second Amended Complaint—which, notably, does not appear in either the government's order or the invoices—never was listed on Govplace's GSA Schedule. Angle Aff. ¶40 [Dkt. 129-1]. The underlying product that is described in the Second Amended Complaint—an HP Compaq nc8430 T2500 15.4 1024/80 PC—also was never listed on Govplace's GSA Schedule. Id. No representation or certification was ever made by Govplace regarding the country of

---

[3] Although the Second Amended Complaint lists the second product (EY685AW) and the eighth product (EY685AW) as being different sales, they are the identical product and have the same purchase order number. Angle Aff. ¶37 [Dkt. 129-1].

origin of the product (EY685AW ) listed as the second and eighth sales in paragraph 117 of the Second Amended Complaint.  Id. ¶41. Moreover, the total amount of this transaction, $181,358, was below the applicable TAA dollar threshold of $193,000 at the time the sale was made.  Id. ¶42.

### Sale By A Third Party For A Product Not Listed On Govplace's GSA Schedule

The last alleged sale identified in paragraph 117 of the Second Amended Complaint was not even made by Govplace.  Angle Aff. ¶43 [Dkt. 129-1].  This sale, which was for the first product (EV266AA) listed in paragraph 117, was made by New Tech Solutions, Inc. ("New Tech") and involved a product that was not listed on Govplace's GSA Schedule.  Id.

New Tech and Govplace were parties to an "Authorized Government Teaming Agreement – GSA Federal IT Schedule 70" dated December 19, 2005, which ended in approximately September 2007.  Angle Aff. ¶44 [Dkt. 129-1].  New Tech certified in the Teaming Agreement "that its participation in the performance of the GOVPLACE Schedule Contract will be in accordance with all its terms, conditions, and prices of the GOVPLACE Schedule Contract."  Id. ¶46.  However, this sale was not made under Govplace's GSA Schedule.  Id. ¶¶48-49.

Product EV266AA, which, notably, is not listed anywhere on the purchase order or invoice, was not listed for sale on Govplace's GSA Schedule.  Angle Aff. ¶49 [Dkt. 129-1].  The underlying product described in paragraph 117 of the

SMRH:200969233.13

Second Amended Complaint—an HP Promo Compaq nx9420 T2300 512/80 PC—also was not listed on Govplace's GSA Schedule.  Id.

The quotation regarding the sale of the first product listed in paragraph 117 was made by New Tech to the government, not by Govplace.  Angle Aff. ¶48 [Dkt. 129-1].  The government placed the order for that product with New Tech, not Govplace.  Id.  New Tech filled the order and invoiced the government, not Govplace.  Id.  Govplace never made any country of origin representation or certification to the government in connection with the sale of the first product listed in paragraph 117 of the Second Amended Complaint.  Id. ¶50.  Nor did Govplace ever submit a claim to the government in connection with that sale.  Id.

**GSA Concluded Govplace Was TAA-Compliant Before
And After Folliard Filed His Complaint**

The government was aware of Govplace's reliance on country of origin information it received from Ingram Micro.  Before, during and after the sales alleged in the Amended Complaint, GSA conducted "Contractor Administrative Visits" of Govplace to evaluate its compliance with GSA Schedule Contract requirements.  Angle Aff. ¶15 [Dkt. 129-1].  Those reviews were conducted in 2003, 2005, 2006, 2007 and 2009.  Id.  During these visits, GSA requested and reviewed Govplace's GSA Schedule orders and invoices to the Government.  Id.  Govplace also illustrated during these visits the process by which the Company received and relied upon information from Ingram Micro regarding the country of

origin information for the products on Govplace's GSA Schedule.  Id.; Robinson

Tr. pp. 35-36 [Dkt. 168-2].

GSA issued an Administrative Report Card after each audit of Govplace's

GSA Schedule, with the exception of 2007 when no Report Card was issued.

Angle Aff. ¶15 [Dkt. 129-1].  As set forth in the Report Cards, GSA expressly

determined that Govplace demonstrated compliance with the TAA and tacitly

approved Govplace's reliance on the country of origin information it received from

Ingram Micro.  Id.  For example, in the March 11, 2009 Report Card, which is

dated approximately two years after Folliard filed his initial complaint in this

action, GSA answered "Yes" to the question "Did the contractor demonstrate

compliance with the Trade Agreements Act?"  Id. ¶16.

# SUMMARY OF THE ARGUMENT

The district court's May 3, 2012 decision to initially restrict the scope of discovery to the specific sales alleged in Folliard's Second Amended Complaint was proper and within its broad discretion to structure discovery.  Other district courts have taken similar steps to manage the discovery process in FCA cases. Moreover, unlike the allegations against many other defendants in the case, Folliard never alleged that the Govplace transactions were "representative" or that there were "other sales to be discovered."  Mem. Op. p. 10 n.2 [Dkt. 156].  The district court never foreclosed the possibility of expanding the scope of discovery in the future, and expressly stated that "if Folliard prevails as to either or both defendants on the specific sales alleged in the complaint, the question of further discovery will be ripe."  Mem. Op. pp. 11 [Dkt. 156].

The district court's July 31, 2012 decision to grant, in part, Folliard's request for additional discovery pursuant to Rule 56(d), FED. R. CIV. P, also was proper and within its discretion.  Although Folliard's first Rule 56(d) request was improperly framed, the district court afforded him a second chance to identify discovery he needed relating to the allegations in the Second Amended Complaint and to explain why that discovery was necessary.   While Folliard's second Rule 56(d) request did not comply with the district court's direction to focus only on the sales alleged in the Second Amended Complaint, the district court found that

several of Folliard's requests were proper and granted him the right to conduct certain additional, focused discovery.  In light of its May 3 Order limiting the initial scope of discovery, the district court acted within its discretion when it only considered and granted Folliard's requests for discovery relating to allegations in his Second Amended Complaint.

The district court's May 3, 2012, July 31, 2012 and March 18, 2013 Orders granting summary judgment in favor of Govplace also were proper and should be affirmed.  Folliard's brief does not address the July 31 Order granting summary judgment regarding (1) products sold pursuant to Govplace's FirstSource contract, which does not require TAA compliance; (2) an "open market" sale of a product not listed on Govplace's GSA Schedule; and (3) a sale by a third party of a product not listed on Govplace's GSA Schedule.  Accordingly, the July 31 Order is not before this Court, and any appeal of that Order was waived.

Folliard appears to argue that the district court improper dismissed his claims regarding the twenty-three products allegedly offered for sale by Govplace—but not sold—based on "lack of scienter."  This argument, however, ignores the district court's May 3 Order dismissing these claims, which is based on the well-established tenet of law that FCA liability attaches to a claim for payment. As has been held by many courts—including courts dismissing other complaints filed by Folliard—merely listing a product for sale to the government does not give

-19-

rise to a violation of the FCA.  Accordingly, to the extent the May 3 summary judgment Order is being appealed, it was proper and should be affirmed.

Finally, the district court properly found there was no evidence that Govplace knowingly violated the FCA.  Not only could Folliard not demonstrate that Govplace ever submitted a false claim, he could not show that Govplace's reliance on country of origin representations it received from Ingram Micro through the GSA Pass Through Program was not reasonable.  The GSA Pass Through Program is designed to help small businesses like Govplace comply with GSA Schedule requirements by leveraging Ingram Micro's resources and capabilities.  Ingram Micro, a fortune 100 company and the world's largest technology distributor, expressly certified to Govplace that the products being offered were compliant with the Trade Agreements Act ("TAA").

Based on Govplace's due diligence, HP's authorization for Govplace to buy products from Ingram Micro, and GSA's findings that Govplace demonstrated compliance with the TAA, Govplace had no reason to question the country of origin information certifications it regularly received from Ingram Micro.  In fact, neither Ingram Micro nor HP ever communicated to Govplace that any country of origin information provided through the Ingram Micro GSA Pass Through Program was not true and correct.  Accordingly, the district court's summary judgment Orders were proper and should be affirmed.

## ARGUMENT

### I.     LEGAL STANDARDS

#### A.     The Standard Of Review For Discovery Orders.

The standard of review for a district court's discovery orders, including an order denying a request for discovery pursuant to Rule 56(d), FED. R. CIV. P., is abuse of discretion.  Northrop Corp. v. McDonnell Douglas Corp., 751 F.2d 395, 399 (D.C. Cir. 1984) ("We may reverse the trial court only if it has abused its discretion; that is, if its actions were clearly unreasonable, arbitrary or fanciful."); see also Messina v. Krakower, 439 F.3d 755, 762 (D.C. Cir. 2006) ("We review a district court's refusal to grant a Rule 56(f) request under an abuse of discretion standard.") (citation omitted).  The district court has broad discretion to weigh the factors in deciding whether discovery should be compelled.  In re Multi-Piece Rim Prods. Liab. Litig., 209 U.S. App. D.C. 416, 653 F.2d 671, 679 (D.C. Cir. 1981).  "The basis for [this] deferential, abuse-of-discretion review of district court discovery rulings is the recognition that supervising the to-and-fro of district court litigation falls within the expertise, in the first instance, of district courts and not courts of appeals."  Watts v. SEC, 482 F.3d 501, 507 (D.C. Cir. 2007) (citation omitted); see also Gaujacq v. EDF, Inc., 601 F.3d 565, 580 (D.C. Cir. 2010) ("This court is 'especially reluctant to interfere with district court decisions regarding their own day-to-day operations,' particularly the District Court's 'broad discretion in structuring discovery.'") (citation omitted).

SMRH:200969233.13

**B.      The Standard Of Review For Summary Judgment Orders.**

The standard of review for a district court's order granting summary

judgment is de novo.  United States ex rel. Bettis v. Odebrecht Contractors of Cal.,

Inc., 393 F.3d 1321, 1325 (D.C. Cir. 2005) (citation omitted).  To avoid summary

judgment, the non-movant cannot rely on "unsupported allegations or denials and

must [support its case with] affidavits or other competent evidence setting forth

specific facts showing that there is a genuine issue for trial."  United States ex rel.

K & R Ltd. P'shp v. Mass. Hous. Fin. Agency, 456 F. Supp. 2d 46, 54 (D.D.C.

2006) (citation omitted).  "[A] party who fails to make a showing sufficient to

establish the existence of an essential element to that party's case, and on which

that party will bear the burden of proof at trial" cannot prevail.  Id. at 53 (citation

omitted).

**C.      Elements Of A Claim Under The False Claims Act.**

A proper claim under the False Claims Act is composed of three elements:

(1) the defendant presented a claim for payment or approval to the government, (2)

the claim was "false or fraudulent," and (3) the defendant acted knowingly that the

claim was false.  United States ex rel. Schwedt v. Planning Research Corp., 59

F.3d 196, 198 (D.C. Cir. 1995).  To survive summary judgment, a relator must

provide at least some evidence supporting each element.  United States ex rel.

Hockett v. Columbia/HCA Healthcare Corp., 498 F. Supp. 2d 25, 71 (D.D.C.

2007) (holding when a relator cannot "point to a single, specific false claim" or sufficiently describe one, he has "failed to create a triable issue of fact."). The relator has the burden of proof for each of these elements wherein each lies the integral element: the existence of a "claim that is false or fraudulent." *See* 31 U.S.C. § 3731.

For years, courts interpreted the FCA as requiring a heightened burden of proof, sometimes characterized as "clear and convincing" evidence. E.g., Hageny v. United States, 570 F.2d 924, 933 (Ct. Cl. 1978); United States v. Milton, 602 F.2d 231, 233 (9th Cir. 1979); United States v. Ekelman & Assocs., Inc., 532 F.2d 545, 548 (6th Cir. 1976); United States v. Ueber, 299 F.2d 310, 314 (6th Cir. 1962). In 1986, Congress amended Section 3731(c) to provide that in any action brought by the United States, the burden of proof shall be by a preponderance of the evidence. By addressing only the burden of proof for the United States, Congress intended to leave unchanged the burden of proof for private relators: clear and convincing evidence. Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson, 545 U.S. 409, 417-18 (2005) (analyzing a different provision of the FCA, but noting that the amendment to Section 3731(c) clearly intended to apply only to actions brought or intervened in by the United States). Because the United States did not intervene in this case, Folliard was required to prove his claims by clear and convincing evidence.

SMRH:200969233.13

## II.  THE DISTRICT COURT'S ORDERS LIMITING THE SCOPE OF DISCOVERY TO THE ALLEGATIONS IN THE COMPLAINT WERE PROPER AND SHOULD BE AFFIRMED.

### A.  The District Court Properly Limited Discovery To The Sales Actually Alleged In The Second Amended Complaint.

The district court's May 3, 2012 and July 31, 2012 Orders properly limited the scope of discovery to the specific sales alleged in the Second Amended Complaint pending a showing by Folliard that the allegations had sufficient merit to survive summary judgment.[4]  Orders [Dkt. 155, 162].  These decisions were well within the district court's broad discretion to limit the scope of discovery in FCA cases and were appropriate under the circumstances.  United States ex rel. Duxbury v. Ortho Biotech Prods., 719 F.3d 31 (1st Cir. 2013); United States ex rel. Schuhardt v. Wash. Univ., 361 F. Supp. 2d 992 (E.D. Mo. 2003), aff'd in part by Schuhardt v. Wash. Univ., 390 F.3d 563, 566 (8th Cir. 2005).

In Duxbury, an action brought under the FCA, the relator alleged that the defendant engaged in a nationwide scheme to induce Medicare providers to submit false and fraudulent reimbursement claims.  719 F.3d at 34.  Although the complaint alleged a "'nationwide' kickback scheme," the trial court denied the

---

[4] Although one of the issues asserted by Folliard is "[w]hether the trial court erred when it denied Plaintiff's Motion to Compel" (App. Brief. p. 2), there is no reference to this motion in Folliard's argument.  Because this issue is not addressed in Folliard's brief, it has been "forfeited on appeal."  Estate of Parsons v. Palestinian Auth., 651 F.3d 118, 143 (D.C. Cir. 2011).

relator's attempt to seek nationwide discovery and instead limited discovery geographically to the eight healthcare providers specifically described in the complaint. Id. at 36. The relator appealed, among other things, the order limiting discovery. The U.S. Court of Appeals for the First Circuit affirmed that order, noting that the district court limited discovery to those allegations in the complaint that satisfied Rule 9(b)'s particularity requirement, and that this result "was entirely consistent with the district court's 'considerable latitude' in assessing the proper scope of discovery." Id. at 39. The district court had acted within its discretion in denying the relator a license to undertake a "fishing expedition" through discovery into the complaint's purely speculative allegations of fraud. Id. (citing United States ex rel. Rost v. Pfizer, Inc., 253 F.R.D. 11, 17 (D. Mass. 2008) (limiting relator's initial discovery on remand to "the sales and marketing region" as to which he had direct knowledge, and acknowledging that if relator's kickback allegations in that region were substantiated, and shown to be based on "national directives, the Court will expand the scope of discovery nationwide")).

Likewise, the trial court in Schuhardt limited initial discovery to the fifteen patients specifically identified in a complaint alleging false claims for attending physicians' services that were performed by residents or non-physicians. 361 F. Supp. 2d at 995-96. In response to the defendant's motion for summary judgment, the relators alleged additional frauds identified during discovery of those fifteen

SMRH:200969233.13

patients.  The court refused to consider them, stating it would "not allow plaintiffs to use discovery to make new allegations against defendant." Id. at 1006.  The relators further contested the summary judgment motion, arguing that they would seek to amend their complaint after being permitted additional discovery.  The court refused, stating it "will not allow this case to continue as a fishing expedition in search of a fraud claim." Id. at 1019.  The court granted summary judgment for defendants based upon only the fifteen claims identified with specificity in the relator's complaint.  Id. at 1020-21.  The U.S. Court of Appeals for the Eighth Circuit affirmed the decision with regard to the claims under the FCA, "adopting the reasoning of the District Court's thorough Memorandum and Order." Schuhardt v. Wash. Univ., 390 F.3d 563, 566 (8th Cir. 2005).

As in both Duxbury and Schuhardt, the district court here acted properly and within its discretion by limiting Folliard's discovery to the particularized allegations in his complaint pending a showing that Folliard's allegations were not just purely speculative allegations of fraud—a showing that Folliard could not meet.  Notably, unlike the allegations against many of the other defendants in this case, and contrary to the assertion in his Appellant brief, Folliard did not allege that the Govplace transactions were "representative."  Mem. Op. p. 10 n.2 [Dkt. 156]; App. Br. p. 19.  Nor did he allege that there were any "other sales to be discovered."  Mem. Op. p. 10 n.2 [Dkt. 156].  Instead, the Second Amended

Complaint alleged only that Govplace offered for sale twenty-three products to the United States that allegedly did not comply with the TAA and "offered and sold" eight HP products to the government that allegedly were manufactured in non-TAA-designated countries. Am. Complaint ¶¶113, 117, 118 [Dkt. 37]. Given these allegations, the district court acted well within its discretion when it initially limited any Rule 56(d) discovery to those sales actually alleged in the Second Amended Complaint pending a showing by Folliard that the allegations had any merit. Because Folliard was unable to substantiate his allegations after obtaining targeted discovery on his allegations, the district court properly did not allow an expansive fishing expedition in search of additional fraud claims.[5]

## B.     The District Court's Rulings Regarding Folliard's Rule 56(d) Requests Were Proper And Should Be Affirmed.

Federal Rule of Civil Procedure 56(d)[6] allows a court to deny a motion for summary judgment or defer deciding the motion if the nonmoving party shows that

---

[5] It also is important to note that, as a relator, Folliard was required to be "an original source," 31 U.S.C. § 3730(e)(4)(A), with "direct and independent knowledge of the information on which the allegations are based." Id. § 3730(e)(4)(B). Not only did Folliard lack evidence supporting his allegations, it appears that his "particularized allegations" were based on Freedom of Information Act ("FOIA") requests and discovery produced in another lawsuit. Mem. Op. pp. 8-9 [Dkt. 171]. As such, the district court also believed there were "serious jurisdictional problems to Folliard's claims." Id. p. 9.

[6] Former Rule 56(f) was renumbered to 56(d) in 2010, without making any substantive changes to the provisions thereof. See Fed. R. Civ. P. Comm. Notes on Rules – 2010 Amendments.

SMRH:200969233.13

it cannot present facts essential to justify its opposition.  <u>McWay v. LaHood</u>, 269

F.R.D. 35, 38 (D.D.C. 2010).  Rule 56(d) is designed to ensure that the non-

moving party is not "railroaded" by a premature motion for summary judgment.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 326 (1986).  However, the burden is on the

party making a Rule 56(d) request to "state concretely" why additional discovery is

needed.  <u>Messina v. Krakower</u>, 439 F.3d 755, 762 (D.C. Cir. 2006) (citations and

internal edits omitted).  The party seeking relief under Rule 56(d) must do more

than offer "'conclusory allegation[s] without any supporting facts' to justify the

proposition that the discovery sought will produce the evidence required."  <u>Id.</u>

(citations omitted).

   A Rule 56(d) movant must satisfy three requirements through submission of

an affidavit.  First, he must explain the particular facts he intends to discover and

why they are necessary to the litigation.  <u>Convertino v. U.S. Dep't of Justice</u>, 684

F.3d 93, 99 (D.C. Cir. 2012) (citation omitted).  Second, he must explain why he

could not produce the facts in his opposition to summary judgment.  <u>Id.</u> at 99-100

(citations omitted).  Finally, he must demonstrate that the facts are actually

discoverable.  <u>Id.</u> at 100 (citation omitted).

   "Folliard's first invocation of Rule 56(d) was improperly framed, as a Rule

56(d) request must 'state concretely' why additional discovery is needed."  Mem.

Op. p. 10 [Dkt. 156].  However, notwithstanding the deficiencies in Folliard's first

Rule 56(d) request, the court provided him with a second opportunity to obtain additional discovery when it ordered on May 3, 2012 that he "be allowed to amend his opposition … limited to the specific sales the complaint alleges as to each defendant" with the guidance that if he "invokes Rule 56(d) in his opposition, the request must describe the necessary discovery with specificity." Id. p. 10-11.

Based on Folliard's supplemental memorandum of law, the court on July 31, 2012 authorized him "to perform focused, targeted discovery for the next 45 days limited *only* to GP's reliance on Ingram Micro's Country of Origin representations … and whether the products sold were, as GP claims, from the United States and Japan." Order p. 2 [Dkt. 162]. In its memorandum opinion, the court explained again that it has the discretion to "tailor limited discovery before again entertaining a motion for summary judgment" and that it "has chosen to tailor discovery and expects the scope of this litigation to remain within the bounds it has set." Mem. Op. pp. 7, 9 [Dkt. 163].

Folliard's Appellant brief recognizes that the district court's July 31 Order "granted [his] motion to conduct limited discovery under Rule 56(d)" regarding the "products listed in the Complaint," but argues that he should have been allowed to proceed with additional discovery regarding hundreds of products not identified in his complaint. App. Br. p. 24. However, as set forth in Section II.A, supra, the district court acted within its discretion and properly limited the scope of initial

discovery to the specific sales alleged in the Second Amended Complaint pending a showing that those allegations had merit.  Messina, 439 F.3d at 762; McWay, 269 F.R.D. at 38.  That is because, as the Court stated on May 3, if Folliard did not have evidence supporting the allegations in his complaint, "he should not be entitled to discovery for other sales, not alleged in the complaint, on which he might prevail."  Mem. Op. p. 10 [Dkt. 156].  Accordingly, the district court acted within its discretion in denying Folliard's Rule 56(d) request for discovery regarding sales not alleged in the complaint.  Schuhardt, 361 F. Supp. 2d at 1020-21 (denying plaintiff's Rule 56(f) motion to defer ruling on summary judgment because the additional discovery requested had nothing to do with the fifteen cases of alleged fraud specifically identified in the complaint).

### C.    The Cases Upon Which Folliard Chiefly Relies Do Not Support His Request For Discovery Unrelated To The Allegations In His Second Amended Complaint.

Folliard identifies several cases upon which he chiefly relies for his argument that the district court improperly limited the full scope of discovery sought in his Rule 56(d) request.  However, these cases do not support Folliard's position and, in actuality, are consistent with the district court's Orders limiting discovery to his allegations of fraud.

In Convertino v. U.S. Dep't of Justice, 684 F.3d 93 (D.C. Cir. 2012), the plaintiff lacked the evidence necessary to survive summary judgment because he

did not know the identity of the person who made a disclosure, and an element of his claim required that the disclosure be intentional or willful.  Noting that the plaintiff still had challenges pending in another jurisdiction to uncover the source of the disclosure, the Court ruled that plaintiff's Rule 56(f) motion should have been granted because there was ample evidence to suggest that additional discovery could reveal the source's identity.  Id. at 105.  Here, in its July 31 Order, the district court did not contravene this Court's reasoning in Convertino when it partially denied Folliard's Rule 56(d) motion (in fact, the district court specifically cited and relied upon Convertino in reaching its ruling).  Mem. Op. pp. 17-18 [Dkt. 163].  Instead, the district court determined that the additional discovery sought by Folliard either lacked specificity or was irrelevant because it did not pertain to the allegations in the Second Amended Complaint to which it had previously limited discovery.  Id. pp. 15-19.

Folliard's reliance on Sparrow v. United Air Lines, Inc., 216 F.3d 1111 (D.C. Cir. 2000), also is misplaced.  Folliard cites this case for the proposition that "[a] plaintiff need not prove evidentiary facts in the complaint nor is he required to allege all the underlying facts entailed by the claim."  App. Br. p. 20.  However, the complaint in Sparrow was scrutinized under the standards for Rule 8 and not under the heightened pleading standards of Rule 9(b).  216 F.3d at 1118.  Here, Folliard was required to plead his allegations of fraud with particularity under Rule

9(b), and, as previously set forth, the district court acted within its discretion to limit discovery to those allegations in the complaint.

Folliard appears to cite Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978), in support of his contention that the additional alleged sales referred to in his opposition to summary judgment were relevant despite not being alleged in the Second Amended Complaint.  However, the Supreme Court noted in Oppenheimer that "discovery, like all matters of procedure, has ultimate and necessary boundaries."  Id. at 351 (citation omitted).  Moreover, unlike this case, Oppenheimer did not involve the heightened pleading standard under Rule 9(b), the legal constraints on jurisdiction under the FCA, or the district court's discretion to limit discovery in such cases.

Finally, Folliard's citation of Burlington N. Santa Fe R.R. Co. v. Assiniboine & Sioux Tribes of Fort Peck Reservation, 323 F.3d 767 (9th Cir. 2003), directly undercuts his argument that he should be entitled to expansive discovery.  Id. at 775 ("Our decision that summary judgment was premature in light of the Rule 56(f) motion does not require that the district court permit wholesale discovery.").  As the district court noted in its July 31, 2012 memorandum opinion, Burlington held that "the district court may tailor limited discovery before again entertaining a motion for summary judgment."  Id.; Mem. Op. p. 7 [Dkt. 163].  This is precisely what the district court did here; by limiting

discovery to the allegations in the Second Amended Complaint, the district court required Folliard to first show that he had some evidence to support his allegations before the court would entertain requests for expansive discovery in search of additional claims.  Folliard was unable to substantiate his allegations despite receiving the additional discovery authorized by the district court.  Therefore, the district court did not abuse its discretion in limiting the scope of discovery.

## III.    THE DISTRICT COURT'S ORDERS GRANTING SUMMARY JUDGMENT WERE PROPER AND SHOULD BE AFFIRMED.

### A.    Folliard Does Not Appeal All Of The District Court's Orders Granting Summary Judgment Regarding Alleged Sales.

Folliard's brief does not address the district court's July 31, 2012 Order granting summary judgment regarding (1) products sold pursuant to Govplace's FirstSource contract, which does not require TAA compliance (product numbers RM266UA and CB367A); (2) an "open market" sale of a product not listed on Govplace's GSA Schedule (product number EY685AW); and (3) a sale by a third party of a product not listed on Govplace's GSA Schedule (product number EV266AA).  Order [Dkt. 162]; Mem. Op. pp. 15-16, 18-19 [Dkt. 163].  Instead, the Appellant brief focuses entirely on the district court's holding that Folliard cannot meet the "knowingly" requirement of a FCA claim in connection with alleged sales of product numbers Q5403A, 416577-B21, AG052A and Q5983A.  Order [Dkt. 170]; App. Br. pp. 28-34.  Accordingly, the Order granting summary judgment

regarding product numbers RM266UA, CB367A, EY685AW and EV266A is not before this Court and, by not addressing this Order on appeal, Folliard has waived any arguments regarding this Order.  Catawba Cnty., N.C. v. EPA, 571 F.3d 20, 38 (D.C. Cir. 2009) (per curiam) (holding petitioners waived two statutory arguments by failing to raise them in opening briefs); World Wide Minerals, Ltd. v. Republic of Kaz., 296 F.3d 1154, 1160 (D.C. Cir. 2002) ("As we have said many times before, a party waives its right to challenge a ruling of the district court if it fails to make that challenge in its opening brief.") (citations omitted); see also Order (Doc. No. 1440795) ("All issues and arguments must be raised by appellant in the opening brief.").

**B.    The District Court Properly Dismissed Folliard's Claims Regarding The Twenty-Three Products Allegedly Offered For Sale By Govplace.**

Folliard's brief appears to contend that the district court improperly dismissed his claims regarding twenty-three products that Govplace allegedly offered for sale to the government—but did not sell—based on "lack of scienter." App. Br. p. 29.  Folliard further appears to contend that such a finding was not proper based on the unsupported assertion that "Appellant showed that for years [Govplace] was provided with HP spreadsheets every month that listed products

that it sold to the GSA from non-TAA compliant countries."[7]  App. Br. p. 29
(emphasis omitted).  Folliard's assertions, however, have no relation to the actual
Order issued by the district court on May 3, 2012 dismissing this claim, which did
not involve a finding regarding scienter.  Order [Dkt. 155].  Instead, the district
court dismissed the claim because there was no allegation that any of these
products ever were sold to the government.

Folliard alleged in paragraph 113 of his Second Amended Complaint that
"[o]n [sic] or about March 2007, … Defendant [Govplace] was offering [twenty-
three] products for sale to the Government on its GSA Schedule, representing that
they were made in the United States, when in fact these products were not made in
a designated country."  Sec. Am. Compl. ¶113 [Dkt. 37].  Nowhere in his Second
Amended Complaint (or his opposition to summary judgment) did Folliard ever
allege that any of these twenty-three products actually were sold to the
government.  Accordingly, the district court dismissed this allegation (and counts
III and IV of the Second Amended Complaint) because Folliard "fail[ed] to
connect allegations of improper listings to the allegations of improper sales ...."
Mem. Op. p. 7 [Dkt. 156].

---

[7] Contrary to Folliard's assertion, there <u>never</u> was a showing below that Govplace
"was provided with HP spreadsheets every month."  As set forth in section
II.C.2(a), <u>infra</u>, the undisputed fact is that Govplace received only one, unsolicited
price list from HP that further demonstrated that the products allegedly sold by
Govplace were manufactured in TAA-compliant countries.

The district court's holding was proper because "[t]he FCA … 'attaches liability, not to underlying fraudulent activity, but to the claim for payment.'" United States ex rel. Totten v. Bombardier Corp. & Envirovac, Inc., 286 F.3d 542, 551 (D.C. Cir. 2002); United States ex rel. Ervin and Assocs., Inc. v. Hamilton Sec. Grp., Inc., 370 F. Supp. 2d 18, 51 (D.D.C. 2005) ("[A] relator must produce evidence that the defendant actually submitted false demands for payment or submitted false records or statements in order to get a false claim paid.").  As a result, several courts—including two other FCA cases filed by Folliard—have held that merely listing products for sale does not, by itself, give rise to a violation of the FCA.  United States ex rel. Folliard v. Hewlett-Packard Co., 272 F.R.D. 31, 35 (D.D.C. 2011) (dismissing complaint alleging only improper listings of products because "to properly plead a § 3729(a)(2) violation, a plaintiff must nevertheless allege that a false claim does, in fact, exist"); United States ex rel. Folliard v. CDW Tech. Servs., Inc., 722 F. Supp. 2d 20, 30 (D.D.C. 2010) ("Absent an allegation that these listings were related to purchases, no inference can be drawn that false claims for payment were submitted."); United States ex rel. Crennen v. Dell Mktg. L.P., 711 F. Supp. 2d 157, 164 (D. Mass. 2010) (dismissing claim because "posting a false statement on a website in the expectation that a claim will be submitted does not trigger liability without pleading a claim or a 'planned' claim.").  Accordingly, the district court's Order dismissing Folliard's claims regarding

-36-

products Govplace allegedly offered for sale to the government was proper and, to the extent it is even before this Court, should be affirmed.

### C. The District Court Properly Found There Was No Evidence That Govplace Knowingly Violated The FCA.

In its March 18, 2013 Order, the district court also properly granted summary judgment regarding product numbers Q5403A, 416577-B21, AG052A and Q5983A. Order [Dkt. 170]. As noted by the district court, "the burden is not on Govplace to prove that its products were made in TAA-compliant countries; Folliard must show that Govplace submitted false claims." Mem. Op. p. 8 [Dkt. 171]. Although multiple grounds existed to grant summary judgment in favor of Govplace on the remaining four products —including the fact that "Folliard cannot prove that Govplace submitted a false claim"—the district court ultimately concluded that "Folliard's failure to provide evidence that Govplace acted 'knowingly' is more glaring, and provides the strongest grounds for granting Govplace summary judgment." Mem. Op. p. 10 [Dkt. 171].

Under the FCA, a person acts knowingly "by (1) having actual knowledge, (2) acting in deliberate ignorance, or (3) acting in reckless disregard." United States ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency, 530 F.3d 980, 983 (D.C. Cir. 2008) (citation omitted). "The first element of 'knowingly' goes after subjective knowledge, while the second seeks out the kind of willful blindness from which subjective intent can be inferred." United States ex. rel. K & R Ltd.

P'ship v. Mass. Hous. Fin. Agency, 456 F. Supp. 2d 46, 61 (D.D.C. 2006) aff'd,

530 F.3d 980 (D.C. Cir. 2008).  "Reckless disregard under the FCA is 'an extreme

version of ordinary negligence.'" K & R Ltd. P'ship, 530 F.3d at 983 (citation

omitted).  This has also been referred to as "gross negligence-plus." United States

v. Krizek, 111 F.3d 934, 942 (D.C. Cir. 1997).  "Mere negligence cannot support

liability under the FCA." K & R Ltd. P'ship, 456 F. Supp. 2d at 61; see also

United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc., 297 F. Supp. 2d

272, 277 (D.D.C. 2004) aff'd, 393 F.3d 1321 (D.C. Cir. 2005).  The issue of

whether a defendant knowingly violated the FCA is appropriate for summary

judgment where, as here, there is no evidence sufficient to support a finding of the

requisite scienter.  United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.,

214 F.3d 1372, 1378 (D.C. Cir. 2000) (affirming summary judgment against FCA

relator by finding, in part, that contractor did not knowingly submit alleged false

claims); United States ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency, 456

F. Supp. 2d 46, 61 (D.D.C. 2006) ("summary judgment is appropriate where

plaintiff produces no evidence sufficient to support a finding of the requisite

scienter.").[8]

---

[8] Folliard's cases also support this proposition.  E.g., United States ex rel. Hocket
v. Columbia/HCA Healthcare Corp., 498 S. Supp. 2d 25, 57-58 (D.D.C. 2007)
("'summary judgment is appropriate where plaintiff produces no evidence
sufficient to support a finding of the requisite scienter'") (citation omitted).

1.    ***Govplace Reasonably Relied On Country Of Origin Information It Received From Ingram Micro Through The GSA Pass Through Program***.

(a)    Govplace Participated In The Ingram Micro GSA Pass Through Program To Ensure Compliance With GSA Schedule Requirements.

Like many other small business resellers, Govplace joined the Ingram Micro GSA Pass Through Program to help its contracts team ensure compliance with GSA Schedule Requirements, including compliance with the TAA.  Robinson Tr. pp. 30, 34-36 [Dkt. 168-2]; Robinson Aff. ¶6 [Dkt. 168-1].  The services provided by Ingram Micro are essential to small resellers like Govplace, who otherwise would face the daunting challenge of having to gather and assess country of origin information from hundreds of individual manufactures for thousands of products.

Govplace depended upon the resources and capabilities of Ingram Micro, a fortune 100 company, and relied on Ingram Micro's country of origin certifications.  Robinson Aff. ¶13 [Dkt. 168-1].  Govplace's participation in the Ingram Micro GSA Pass Through Program was based on a "careful due diligence process," which concluded that participation in the program "was the most effective way for [Govplace] to ensure TAA compliance inside the business …" Robinson Tr. pp. 30, 34-36 [Dkt. 168-2].  Based on its due diligence, Govplace was confident that the country of origin information it received through the GSA Pass Through Program would be in full compliance with the TAA.  Id.

Pursuant to Letters of Supply, HP authorized Govplace to participate in the

Ingram Micro GSA Pass Through Program. Angle Aff. ¶7 [Dkt. 129-1]; Robinson

Aff. ¶6 [Dkt. 168-1]. Through this participation, Govplace regularly received HP

product lists from Ingram Micro for products intended to be sold through the GSA

Schedule program and in accord with the rules and regulations of that program.

Robinson Aff. ¶10 [Dkt. 168-1]. The transmittal emails expressly stated that the

attached product lists constituted the "current GSA product/price list for Hewlett

Packard." Id. ¶¶11-12; S.O.F. ¶7 [Dkt. 129]. Moreover, many of the transmittal

emails Govplace received included the following express certification:

> Ingram Micro passes through the following manufacturer
> certifications: … *Products offered by the manufacturer are compliant*
> *with the Trade Agreements Act.*

Id. (emphasis added). Those transmittal emails further stated that "[a]ny deleted

items are being removed from the price list because they … no longer satisfy the

requirements of the Trade Agreements Act …." Id.

The country of origin information that Govplace received from Ingram

Micro as part of the GSA Pass Through Program in May 2006, June 2006, August

2006, September 2006, October 2006, January 2007 and September 2007—both

before and after the five alleged sales at issue—expressly stated that product

numbers Q5403A, 416577-B21, AG052A and Q5983A were manufactured in the

United States and Japan.  Robinson Aff. ¶12 [Dkt. 168-1].[9]  Neither Ingram Micro

nor HP <u>ever</u> communicated to Govplace that any country of origin information

provided through the Ingram Micro GSA Pass Through Program was not true and

correct.  <u>Id.</u> ¶14.

      (b)   <u>Govplace's Reliance On Country Of Origin</u>
              <u>Representations From Ingram Micro Was Reasonable.</u>

Folliard's Appellant brief—and his briefs below—"do[] not dispute that

Govplace relied solely on Ingram Micro's representations about the country of

origin for the disputed product numbers."  Mem. Op. p. 14 [Dkt. 171].  Instead,

Folliard takes the position that Govplace's reliance constituted "reckless disregard"

or "gross negligence plus."  App. Br. p. 31.  That is despite the undisputed facts

that (1) Govplace conducted extensive due diligence of Ingram Micro and the GSA

Pass Through Program before participating, (2) HP expressly authorized Govplace

to participate in the Ingram Micro GSA Pass Through Program, (3) Ingram Micro

expressly certified to Govplace on a regular basis that the country of origin of

products in its price lists were TAA-compliant, and (4) Govplace relied on the

country of origin certifications from Ingram Micro.  As found by the district court,

---

[9] The August 2006, September 2006, October 2006, January 2007 and September 2007 product lists include all four remaining products at issue.  The May and June 2006 product list include product numbers Q5403A, AG052A and Q5983A, but do not include product number 416577-B21.  Product number 416577-B21 first appears on the August 2006 Ingram Micro product list.

Govplace's reliance on Ingram Micro was reasonable under the circumstances. Mem. Op. p. 17-18 [Dkt. 171].

The district court found that Govplace's reliance on Ingram Micro was akin to the reliance of Hamilton Securities Group, Inc. ("Hamilton") on the expertise of its subcontractors in <u>United States ex rel. Ervin and Assocs., Inc. v. The Hamilton Sec. Grp., Inc.</u>, 298 F. Supp. 2d 91 (D.D.C. 2004) ("<u>Ervin I</u>"); Mem. Op. p. 16 [Dkt. 171]. In <u>Ervin I</u>, Hamilton was awarded a contract to "assist HUD in developing and implementing a pioneer program to dispose of HUD-held mortgage notes through public auctions" <u>Id.</u> at 93, 100. In order to meet the requirements of the contract, "Hamilton reinforced its capabilities by subcontracting with two nationally known concerns whose names spoke for themselves: Bell Laboratories (Bell Labs), a major scientific research facility, and the accounting firm of Coopers & Lybrand." <u>Id.</u> at 93-94. Hamilton approached Bell Labs because of its expertise in the industry. <u>Id.</u> at 94.

For one of the notes sales, a temporary fix was used by Bell Labs regarding a computer optimization model that resulted in one of the highest bidders being inadvertently dropped from the list of winning bidders. <u>Id.</u> at 96-97. A relator filed suit against Hamilton under the FCA, alleging "that Hamilton and its subcontractors 'act[ed] in reckless disregard of the truth or falsity of the auction optimization results'…." <u>Id.</u> at 100 (emphasis omitted). In granting, in part,

-42-

Hamilton's motion for partial judgment, the court found that Hamilton's reliance

on Bell Labs did not satisfy the "knowing" requirement of a claim under the FCA:

> it was therefore not negligent in the extreme, if negligent at all, for Hamilton to rely on an organization like Bell Labs and forego attempts to further test Bell Labs / Schindler's temporary fix. Proof of reckless disregard requires much more than errors, even egregious errors. Hamilton, due to the complexity of the pioneer, massive, and time-sensitive note sale transaction, subcontracted the work of developing an optimization formula to a prestigious scientific laboratory and the task of operating the auction itself to Coopers & Lybrand, a major financial services firm.

Id. at 101.

Here, as set forth previously, Govplace relied on the expertise of Ingram

Micro—an authorized HP dealer, a leader in the IT industry, and one of the largest

sellers of IT products to the government—and participated in the Ingram Micro

GSA Pass Through Program to help ensure its compliance with the requirements of

its GSA Schedule.  Robinson Aff. ¶13 [Dkt. 168-1].

Folliard contends that a subsequent decision, "Ervin II," is "more

analogous."  App. Br. p. 33.  However, as found by the district court, that decision

is inapposite to the facts of this case.  Mem. Op. pp. 15-18 [Dkt. 171].  In Ervin II,

370 F. Supp. 2d 18 (D.D.C. 2005), the court "found that Hamilton's failure 'to

make simple inquiries which would [have] alerted Hamilton that there was a

problem' with the sub-contractor's optimization model constituted 'gross

negligence plus.'"  Id. p. 16.  Folliard contends that Ervin II applies because

Govplace "did affirmatively represent to the GSA that it would supply TAA-compliant products when it completed its TAA certification."  App. Br. p. 33.

However, as found by the district court, that "argument misses the mark." Mem. Op. p. 16 [Dkt. 171].  As explained by the district court:

> As stated by Folliard himself, "the *Ervin I* defendant did not have the requisite intent because the defendant apparently did not affirmatively represent that it would verify the results of the sub-contractor's work." Similarly, while Govplace told the government that it would supply TAA-compliant products, Govplace did not affirmatively represent that it would verify the county of origin information provided by its sub-contractor, Ingram Micro.

Id. (citation omitted).  Moreover, the court in Ervin II did not hold that a failure to review every available document for inconsistencies with claims submitted to the government, after conducting extensive due diligence, constituted gross negligence plus.  370 F. Supp. 2d at 41 ("S. 1562 defines this obligation as to make such inquiry as would be reasonable and prudent to conduct under the circumstances to ascertain the true and accurate basis of the claim.  Only those who act in gross negligence of this duty will be found liable under the False Claims Act.") (citation omitted).

Folliard also contends that Govplace "'failed to make simple inquiries' of its own records that would have prevented" alleged FCA violations.  App. Br. p. 33-34.  However, as set forth in section III.C.1(a), supra, and section III.C.2, infra, Govplace's records confirmed that the products it sold to the government were

manufactured in TAA-compliant countries.  Moreover, Govplace had conducted

due diligence regarding the GSA Pass Through Program and had no reason to

question the certifications from Ingram Micro.  As found by the district court,

> absent some reason to question Ingram Micro's representations, it was
> not gross negligence-plus for Govplace not to separately certify that
> the products were TAA-compliant. Govplace inquired into Ingram
> Micro's procedures for certifying product lists, and after reviewing
> Ingram Micro's practices, decided to partner with Ingram Micro…
> Govplace is not required, after concluding its "due diligence process
> with Ingram Micro," to recheck all of Ingram Micro's subsequent
> representations. If Govplace had such a duty, it would undermine the
> beneficial effects of the partnership—Govplace could no longer
> leverage Ingram Micro's greater resources, as Govplace would have
> to redo all the certification checks done by Ingram Micro.

Mem. Op. p. 17-18 (citation omitted) [Dkt. 171].

Folliard also cites Crane Helicopter Servs., Inc. v. United States, 45 Fed. Cl.

410, 434 (Fed. Cl. 1999); however, Crane does not support his position that

Govplace's actions constituted gross negligence plus.  In Crane, the government

asserted a counterclaim under the FCA alleging that Crane misrepresented the

model of helicopter it used to provide services.  The court held that Crane did not

act in reckless disregard when it represented the model of helicopter—despite the

government's argument that Crane should have reviewed all records associated

with the helicopter and not just the most recent logbooks—because Crane had

undertaken a prudent and thorough inspection of the helicopter.  Id. at 445-48.  The

court further held that Crane's actions were inconsistent with a desire to remain

ignorant of the true nature of the aircraft given deliberate invitations to the

helicopter manufacturer, the contracting agency, and the FAA to inspect its aircraft

on multiple occasions. Id. at 450. Here, as in Crane, Govplace conducted due

diligence regarding Ingram Micro's GSA Pass Through Program and, as set forth

below, had multiple inspections by GSA that confirmed the Company's TAA

compliance.

(c)    The Government Tacitly Approved Govplace's Reliance<br>On Ingram Micro's Certifications.

Not only was it reasonable under the circumstances for Govplace to rely on

representations by a company like Ingram Micro, which expressly was authorized

in writing by HP to sell HP products to Govplace for resale to the Federal

government, but the government also reviewed Govplace's reliance on the country

of origin information it received from Ingram Micro. Before, during and after the

five alleged sales, GSA conducted "Contractor Administrative Visits" of Govplace

to evaluate its compliance with GSA Schedule Contract requirements. S.O.F. ¶13

[Dkt. 129]. During these visits, GSA requested and reviewed Govplace's GSA

orders and invoices to the government. Id. Govplace also illustrated to GSA

during these visits the process by which the Company received and relied upon

information from Ingram Micro regarding the country of origin information for the

products on Govplace's GSA Schedule. Id.; Robinson Tr. pp. 35-36 [Dkt. 168-2].

-46-

The GSA Administrative Report Card issued after each audit of Govplace's GSA Schedule expressly stated that Govplace demonstrated compliance with the TAA, and tacitly approved Govplace's reliance on the country of origin information it received from Ingram Micro.  S.O.F. ¶13 [Dkt. 129].  If GSA had any concerns with Govplace's reliance on Ingram Micro, it would have noted those concerns to Govplace and would not have expressly determined that Govplace "demonstrate[d] compliance with the Trade Agreements Act."  Id.  As recognized by the district court, these findings by GSA "may suggest that the government … approved of Govplace relying on Ingram Micro's representations; or at the least that the government did not require Govplace to independently verify each of Ingram Micro's country of origin claims."  Memo. Op. p. 17 [Dkt. 171].

**2.      *The Discovery Produced By Govplace Further Supports The District Court's Finding That The Company Did Not Violate The FCA.***

Pursuant to the Court's July 31, 2012 Order, Folliard conducted discovery regarding product numbers Q5403A, 416577-B21, AG052A and Q5983A.  Order [Dkt. 162].  None of that additional discovery supported Folliard's allegations that Govplace violated the FCA.  In fact, although the additional documents produced by Govplace were not relied upon by the Company, they further confirmed that, at the time Govplace allegedly sold each of the four products at issue, they were manufactured in a TAA-compliant country.

a.     The Unsolicited Email Govplace Received From HP
Confirms That The Products Were TAA-Compliant

In searching its archival database for information responsive to Folliard's

discovery requests, Govplace found that certain sales personnel received an

unsolicited email from HP dated August 27, 2007, which included an attachment

listing country of origin information for certain HP products.  Robinson Aff. ¶15

[Dkt. 168-1].  Govplace did not find any record that this unsolicited product list

was utilized for any purpose.  Id.  Moreover, contrary to Folliard's unsupported

assertion that Govplace "was provided with HP spreadsheets every month" (App.

Br. p. 29), Govplace did not find any other product lists or country of origin

information that it received from HP.  Id.  Notably, unlike the product information

provided to Govplace by Ingram Micro as part of the GSA Pass Through Program,

the HP information did not appear to be specifically filtered to include only those

products that HP and Ingram Micro intended to be sold to the government through

a GSA Schedule, but instead appears to have been assembled for broader use.  Id.

The unsolicited August 2007 product list from HP includes two of the four

products at issue:  product numbers Q5403A and Q5983A.  Robinson Aff. ¶16

[Dkt. 168-1].  The product list states that product Q5403A was manufactured in the

United States, Japan and China.[10]  Id.  Both the United States and Japan are TAA-compliant countries.  FAR 52.225-5.  Likewise, the product list states that product Q5983A was manufactured in Japan—a TAA-compliant country—and China.  Id.  Thus, although the HP product list was received by Govplace after the alleged sales of products Q5403A and Q5983A and had limited evidentiary value, it supported Govplace's understanding that products Q5403A and Q5983A were both manufactured in TAA-compliant countries.

Because the HP email was sent after the products at issue were sold and further shows that they were manufactured in TAA-compliant countries, the district court found that "it was not reckless or deliberately ignorant for Govplace to continue to rely on Ingram Micro's country of origin representations."  Mem. Op. p. 19 [Dkt. 171].  The district court's finding was proper because the HP product list confirms the country of origin information provided by Ingram Micro; namely, that product numbers Q5403A and Q5983A were manufactured in the United States and Japan.

---

[10] While HP products often are manufactured in more than one country, products that are intended for sale to the Federal government under contracts with a TAA requirement are manufactured in TAA-compliant countries.  Robinson Aff. ¶16 [Dkt. 168-1]; Mem. Op. p. 19 [Dkt. 171] (finding that the HP product list "indicat[es] that … products intended for the public sector were made in a TAA-compliant country.").

b.     The Unsolicited Tech Data Price Lists Also Confirm
       That Products Were TAA-Compliant.

Govplace also located and recovered in its archival database five unsolicited

price lists that it received from Tech Data during the period from January 1, 2006

through the date of the last alleged sale in September 2007 that contained country

of origin information for certain HP products.  Robinson Aff. ¶17 [Dkt. 168-1].

Tech Data is a competitor of Ingram Micro and presumably sent these price lists to

Govplace in an effort to solicit its business.  Id.  Because of the Govplace

relationship with Ingram Micro and its participation in the GSA Pass Through

Program, Govplace had no need for Tech Data's unsolicited information and

disregarded it.  Id.  However, notwithstanding the fact it never was utilized, the

Tech Data documentation further confirmed that the products sold by Govplace

were manufactured in TAA-compliant countries.

The January 2006, February 2006 and March 2006 price lists from Tech

Data include country of origin information for product numbers Q5403A and

Q5983A.  Robinson Aff. ¶18 [Dkt. 168-1].  They do not include product numbers

416577-B21 or AG052A.  Id.  These three price lists state that product number

Q5403A was manufactured in the United States, and product number Q5983A was

manufactured in Japan – both TAA-compliant countries.  Id.; FAR 52.225-5.  That

is the identical country of origin information contained in the certified Ingram

Micro price lists and thus confirms the information provided to Govplace by

Ingram Micro.  Robinson Aff. ¶18 [Dkt. 168-1].  Accordingly, all of the country of origin information Govplace received—whether relied upon or not—prior to the alleged sales of product numbers Q5403A on April 18, 2007; Q5403A on April 23, 2007; Q5983A on May 5, 2007; and AG052A on May 16, 2007, demonstrate that those products were manufactured in TAA-compliant countries.  Id. ¶19; S.O.F. ¶22 [Dkt. 129].

Govplace also received price lists from Tech Data in August and September 2007.  Robinson Aff. ¶19 [Dkt. 168-1].  These price lists were received after the alleged sales of product number Q5403A on April 18, 2007; product number Q5403A on April 23, 2007; product number Q5983A on May 5, 2007; and product number AG052A on May 16, 2007.  Id.  The only alleged sale that had not yet occurred at the time that Govplace received these price lists was product number 416577-B21, which allegedly occurred on September 21, 2007.  Id.; S.O.F. ¶22 [Dkt. 129].  Tech Data's August and September 2007 price lists represented that the version of product 416577-B21 that it was offering for sale at that time was manufactured in Costa Rica, the Philippines, Malaysia and China.  Robinson Aff. ¶19 [Dkt. 168-1].  At the time of the alleged sale (and at present), Costa Rica was a TAA-compliant country.  FAR 52.225-5 ("Designated country means any of the following countries: … (4) … Costa Rica ….") (July 1, 2007).  Accordingly, the

version of product number 416577-B21 offered for sale by Tech Data in August

and September 2007 was expressly manufactured in a TAA-compliant country.

Unlike the certifications and representations Govplace received from Ingram

Micro, Tech Data did not stand behind the accuracy of the information in its price

lists:

> Products quoted were selected by Tech Data based on specifications
> available at the time of the quotation, *and are not guaranteed to meet*
> *bid specifications*.  Product specifications may be changed by the
> manufacturer without notice.  *It is your responsibility to verify*
> *product conformance to specifications of any subsequent contract*.
> All products are subject to availability from the manufacturer.  *Tech*
> *Data is not responsible for compliance with regulations, requirements*
> *or obligations associated with any contract resulting from this*
> *quotation* unless said regulations, requirements or obligations have
> been passed to Tech Data and approved in writing by an authorized
> representative of Tech Data.

Robinson Aff. ¶21 (emphasis added) [Dkt. 168-1].  As found by the district court,

the statement by Tech Data "stands in stark contrast to the express language

included in several of Ingram Micro's transmittal emails" that include the

certification that "[p]roducts offered by the manufacturer are compliant with the

Trade Agreements Act."  Mem. Op. p. 20 (emphasis omitted) [Dkt. 171].

Although Govplace disregarded the Tech Data product lists, and

notwithstanding the fact that the product lists further confirmed that the products

Govplace sold were TAA-complaint, Govplace had no reason to believe that the

Tech Data country of origin information was more accurate than the information it

received from Ingram Micro through the GSA Pass Through Program that included

products intended specifically to be sold through Govplace's GSA Schedule.  In

actuality, it was far less reliable.  Not only did "[t]he Tech Data price lists, on their

face, disclaim their reliability" and "explicitly disclaim any representations about

meeting bid specifications" (Mem. Op. pp. 20-21, Dkt. 171), but the August 2007

unsolicited Tech Data price list was inconsistent with the generalized price list

Govplace received from HP that same month, which calls into question the

veracity of Tech Data's price list.  Robinson Aff. ¶20 [Dkt. 168-1].  As such, "it

was neither extreme negligence, nor deliberate ignorance, nor reckless disregard of

the truth to continue relying on country of origin information provided by Ingram

Micro."  Id. p. 21.  The unsolicited product lists from Tech Data—which expressly

disclaimed their accuracy—were insufficient to support a finding that Govplace's

reliance on Ingram Micro constituted "gross negligence plus."  Accordingly, the

district court's finding that the "Tech Data lists cannot show that Govplace

'knowingly' submitted false claims" was proper and should be affirmed.

c.    Summary Judgment Is Appropriate Where, As Here,
There Is No Evidence Of A TAA Violation, Let Alone
Intent To Deceive.

Although there was no evidence showing that any of the products actually

sold by Govplace were manufactured in non-TAA-compliant countries, such

evidence would not, by itself, "demonstrate knowledge of a false claim or an intent

to deceive the federal government." United States ex rel. Hill v. Univ. of Med. & Dentistry of N.J., 448 Fed. Appx. 314, 317, (3d Cir. 2011) (affirming summary judgment regarding scienter "[b]ecause plaintiff presented evidence only demonstrating a scientific disagreement over the reliability of the data, and not evidence as to defendants' knowledge of the falsity, [so] liability does not attach."); see also United States ex rel. Taylor-Vick v. Smith, 513 F.3d 228, 232 (5th Cir. 2008) (affirming summary judgment regarding scienter and finding that "a relator … cannot survive summary judgment merely by submitting evidence of false claims; she must have evidence that the defendants knowingly or recklessly cheated the government.").

At best, any inconsistency in country of origin information "might be proof of a mistake or even negligence" but "it does not prove that defendant[] knowingly submitted false information. United States ex rel. Hill, 448 Fed. Appx. at 317 (citation and internal quotations omitted). Indeed, it is well established that "innocent mistakes, mere negligence, or even gross negligence (without more) are not actionable under the False Claims Act." United States ex rel. Ervin, 298 F. Supp. 2d at 101 (citation omitted); see also United States ex rel. Lockyer v. Haw. Pac. Health, 490 F. Supp. 2d 1062, 1079 (D. Haw. 2007) ("It is not enough that Plaintiffs can point to certain claims that may have been technically incorrect. The

Defendants are not liable under the FCA even if they negligently submitted these false claims.").

Moreover, even if evidence existed that Govplace sold products that did not comply with the TAA—and no such evidence ever was proffered by Folliard—that still would not, by itself, give rise to a FCA claim.  United States ex rel. Hopper v. Anton, 91 F.3d 1261, 1266 (9th Cir. 1996) ("Violations of laws, rules, or regulations alone do not create a cause of action under the FCA."); see also United States ex rel. Lamers v. City of Green Bay, 168 F.3d 1013, 1020, (7th Cir. 1999) ("[T]he FCA is not an appropriate vehicle for policing technical compliance with administrative regulations.  The FCA is a fraud prevention statute; violations of Federal Transit Act regulations are not fraud unless the violator knowingly lies to the government about them.").  Here, however, the unsolicited information Govplace received from HP and Tech Data further confirms that Govplace did not violate the TAA.  Accordingly, the district court's summary judgment Order should be affirmed.

**D.     The Albright Declarations Did Not Comply With Rule 56(c)(4) And Were Unreliable.**

Folliard's brief frequently cites declarations and a report from Jeremy Albright, Ph.D ("Albright") (Dkt. Nos. 158-1; 158-6), a consultant retained "to provide analysis in the matter of United States ex rel. Joe Liotine v. CDW Gov't, Civil Action No. 05-00033-DRH-CJP."  App. Br. pp. 21, 25-26, 31.  The assertions

in Albright's declarations and report, however, were fatally deficient as they failed to comply with the requirements of Rule 56(c)(4).  Moreover, the declarations and report were unreliable, and did not create an issue of material fact.  As such, the district court "had serious concerns about the source material and admissibility of Dr. Albright's analysis" and the declarations and report were properly disregarded. Mem. Op. p. 10 [Dkt. 171].

## 1.    *The Albright Declarations Violated Rule 56(c).*

Rule 56(c)(4), FED. R. CIV. P., expressly requires that "[a]n affidavit or declaration used to … oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Notwithstanding these requirements, Albright never claimed to have the requisite "personal knowledge" regarding the assertions in his declarations and report.  That is despite the fact that he had ample opportunity to cure this fatal deficiency.[11]  Instead, Albright's December 15, 2011 Declaration, (Dkt. 134-8), May 8, 2012 Declaration (Dkt. 158-1) and report entitled "Analysis of GovPlace [sic] GSA Sales Data" (Dkt. No. 158-8) each were made "to the best of [his] knowledge."  Such a declaration is not sufficient to meet the "personal knowledge" requirement of Rule 56(c)(4) and is

---

[11]Although Govplace identified this deficiency to Folliard on December 27, 2011 (Reply p. 10, Dkt. 142), no effort was made to address it in Albright's May 8, 2012 Declaration (Dkt. 158-7) or his May 8, 2012 report (Dkt. 158-8).

properly disregarded.  E.g., Londrigan v. Fed. Bureau of Investigation, 670 F.2d 1164, 1174 (D.C. Cir. 1981) (noting that the "requirement of personal knowledge by the affiant is unequivocal, and cannot be circumvented" and "[a]n affidavit based merely on information and belief is unacceptable.") (citation omitted); see also Lopez-Carrasquillo v. Rubianes, 230 F.3d 409, 414 (1st Cir. 2000) (finding affidavit submitted in opposition to motion for summary judgment which stated that "'it is correct in all its parts to the best of my knowledge'" was "insufficient as a proffer of evidence because affidavits submitted in opposition to a motion for summary judgment must be based on the affiant's personal knowledge"). Nowhere did Albright purport to have any firsthand knowledge regarding any of the assertions in his declarations or report, let alone any statement in Govplace's Statement of Undisputed Material Facts.

Albright's declarations and report also violated the requirement of Rule 56(c)(4) that they "set out facts that would be admissible in evidence."  The underlying data referred to by Albright was based entirely on summary information that was prepared by a third party and purportedly provided to him in another case from some unidentified source.  Albright Decl. ¶¶2-3 [Dkt. 134-8]; Albright Report p. 3 [Dkt. 158-8].  As such, the third party information referenced in the declarations and report for the truth of the matter asserted was inadmissible hearsay.  E.g., FED. R. EVID. 801 ("'Hearsay' is a statement, other than one made

by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."); United States v. Watkins, 519 F.2d 294, 296 (D.C. Cir. 1975) (holding that rent receipts were hearsay where they were offered for the truth of that assertion, that is, that the defendant "did in fact pay the rent" on the apartment at issue in that case).

Moreover, according to Albright and Folliard, not only was the country of origin information referenced by Albright produced in discovery in another case, the alleged sales data was received in response to at least three FOIA requests. McKnight Decl. ¶¶8, 11, 15  [134-1]; Albright Report p. 3 [Dkt. 158-8].  As found by the district court, this admission "raises questions as to th[e] Court's jurisdiction" as Folliard "was not the original source of" the data.  Mem. Op. pp. 8-9 [Dkt. 171].

Because Albright's declarations did not comply with Rule 56(c)(4), they were properly disregarded by the district court.

## 2. *The Albright Declarations Were Unreliable.*

Although Albright claimed to possess GSA sales records relating to HP sales by Govplace and HP country of origin information relating to those sales, no such records were attached to his declarations.  Albright Report p. 3 [Dkt. 158-8]. Instead, the Albright report generally referred to "CoO summaries" that allegedly were produced in another FCA case.  Id. p. 3.  Nowhere, however, does Albright

provide any explanation regarding, among other things, who prepared the summary information, when the summary information was prepared, or even how the summary information was prepared.  Id.

There also is nothing in either Albright declaration contending that any of the information in the "CoO summaries" ever was provided to Govplace, let alone attempting to controvert Govplace's reliance on the information and certifications it received from its vendor, Ingram Micro.  As noted by the district court, "conclusory statements that Govplace sold Chinese-made goods are not admissible evidence."  Mem. Op. p. 10 n.2 [Dkt. 171].

Albright's report also is unreliable on its face.  Incredibly, dozens of alleged sales that Albright contends violate the TAA were allegedly manufactured in "JP" (Japan), the "US" (United States), "SG" (Singapore), or some other TAA-compliant country.  Albright Report pp. 6-24 [Dkt. 158-8].  There are at least 100 alleged sales of products manufactured in Japan alone.  Id.  It is apparent that no effort was made in the "analysis" to account for products that allegedly were manufactured in both TAA-compliant and non-compliant countries.

Moreover, the Albright report failed to acknowledge, let alone even consider, the numerous exceptions to TAA compliance, including small business set aside contracts for small businesses (e.g., the FirstSource Contract), acquisitions of end products for resale, acquisitions not using full and open

competition, acquisitions under the TAA threshold amount, and the other exceptions identified under FAR 25.401(a)(1)-(5) (2007 and 2008). That is presumably because Albright purports to be a "statistical consultant" with a "Ph.D in Political Science" without any stated expertise regarding the TAA. Albright Report p. 2 [Dkt. 158-8]. In addition, although Albright's report contends that "no COO files were available from HP prior to October 2004," it still asserted conclusions regarding TAA compliance for numerous alleged sales prior to October 2004. Id. pp. 7-23. Accordingly, Albright's declarations and report were unreliable and fatally deficient, and were properly excluded by the district court.

## <u>CONCLUSION</u>

For the foregoing reasons, the district court's Orders granting summary judgment to Govplace and limiting the scope of discovery to the allegations in the Second Amended Complaint were proper and should be affirmed.

Respectfully Submitted,

<u>/s/ Christopher M. Loveland</u>
Christopher M. Loveland
(D.C. Bar No. 473969)
Jonathan S. Aronie
(D.C. Bar No. 443151)
Sheppard Mullin Richter & Hampton LLP
1300 I Street, N.W., 11th Floor East
Washington, D.C. 20005-3314
Tel. (202) 772-5313
Fax (202) 312-9432
cloveland@sheppardmullin.com
jaronie@sheppardmullin.com

Dated: August 30, 2013                *Attorneys for Appellee Govplace*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.     This brief complies with the type-volume limitation of Rule 32(a)(7)(B), FED. R. APP. P., because it contains 13,984 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii), FED. R. APP. P.

2.     This brief complies with the typeface requirements of Rule 32(a)(5), FED. R. APP. P., and the type style requirements of Rule 32(a)(6), FED. R. APP. P., because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point font and Times New Roman type style.

/s/ Christopher M. Loveland
Christopher M. Loveland
Counsel for Appellee Govplace

## CERTIFICATE OF SERVICE

I hereby certify that on August 30, 2013, I caused to be electronically filed the foregoing Brief of Respondent with the Clerk of the Court for the U.S. Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. All participants are registered CM/ECF users, and will be served by the CM/ECF system.

Paper copies have also been mailed to the following counsel for Appellant via first class mail, postage prepaid:

> H. Vincent McKnight, Jr.
> McKnight & Kennedy, LLC
> 8601 Georgia Avenue
> Suite 1010
> Silver Spring, MD 20910
> *Counsel for Plaintiff-Appellant*

> /s/ Christopher M. Loveland
> Christopher M. Loveland
> Counsel for Appellee Govplace